## FLEMING v. MYERS.
### No. 11405.

Circuit Court of Appeals, Ninth Circuit.

Feb. 4, 1947.

George Moncharsh, Deputy Adm. of Enforcement, David London, Director, Litigation Division, Albert M. Dreyer, Chief, Appellate Branch, Nathan Siegel, Sp. Appellate Attorney, and Abraham H. Maller. Special Appellate Attorney, OPA, Office of Temporary Controls, all of Washington, D. C., William B. Wetherall, Regional Litigation Attorney, OPA, Office of Temporary Controls, of San Francisco, Cal., for appellant.

Knapp, Boyle, Bilby & Thompson, B. G. Thompson and Arthur Henderson, all of Tucson, Ariz., for appellee.

Before GARRECHT, DENMAN, and ORR, Circuit Judges.

ORR, Circuit Judge.

Appellant, the Administrator, in a complaint for treble damages, charged appellee, a wholesaler of malt beverages, with violations of Maximum Price Regulation No. 259 [1] by reason of sales, during the period December 1, 1943 to August 26, 1944, at prices in excess of those permitted by said Regulation.

The parties, by a "Stipulation for Judgment", submitted the case to the trial court without further evidence.

By the stipulation the parties agreed that March 1942 should be considered the "base period" and that during March 1942 appellee did not pay the cost of return freight on empty beer bottles and cases to his supplier and, further, that during that month appellee did not pay any brokerage commissions in connection with the purchase of any malt beverage handled by him during that month.

It was also provided in paragraph 6 of the stipulation that the proper method of computing maximum prices on brands of beer sold by appellee later than, but not during, March 1942 "shall be as provided by Section 3(a) (§ 1499.3(a)) of the General Maximum Price Regulation." [2] The Administrator in his brief concedes that appellee's "sales without dispute fall within"

---

[1] 7 F.R. 8950.

[2] 7 F.R. 3153–4, 3156.

this section, that is, that the sales involved here were of commodities sold by appellee for the first time subsequent to the base period.

Section 1499.3 so stipulated to be controlling, reads, in part, as follows:

"(a) *Sales at wholesale or retail.* In the case of a sale at wholesale or retail, the seller (1) shall select * * * the comparable commodity * * *; (2) shall divide his maximum price for that commodity by his replacement cost of that commodity; and (3) shall multiply the percentage so obtained by the cost to him of the commodity being priced under this paragraph. * * *

"(n) 'Replacement cost' shall be the net price paid by the seller *after May 18, 1942,* or the net price which the seller would have to pay to replace such commodity *after such date".* (Emphasis supplied.)

The determination of the question of whether, under that regulation, appellee was entitled to include return freight and brokerage fees actually paid by him as part of his costs where it was not disputed that appellee had not paid such charges during the base period on his "comparable commodity", was the legal question submitted to the trial court.

■ Apart from those two controverted charges some overcharges were admitted by appellee and it was stipulated that if the trial court construed the controlling regulation so as to permit appellee to include the disputed charge of return freight judgment should be reduced in the sum of $4,223.30, and "that in the event the trial court should find both return freight and commissions, brokerage charges, and finder's fees paid by said defendant in connection with the purchase of the * * * commodities constitute proper elements of net unit cost," judgment should be entered for the Administrator in the sum of $18,-329.20. In the event the trial court sustained the Administrator's interpretation, judgment should be entered for him in the sum of $27,426.14.

The trial court entered judgment for the Administrator in the sum of $18,329.20, which compels the conclusion that said court construed the regulation as permitting appellee to include as an item of his costs all disputed items.

The Administrator contends, despite the plain definition of "replacement cost" in § 1499.3 as the "net price paid by the seller *after May 18, 1942,* or the net price which the seller would have to pay to replace such commodity *after such date",* that Maximum Price Regulation No. 259 permits a seller to pay his supplier only the charges imposed by the supplier during the base period (March 1942).

His argument is that the term "net price" in the definition of "replacement cost" in § 1499.3 means "legal net price"; that is, that although said regulation provides that "the net price which the seller would have to pay to replace such commodity after such date [i.e. May 18, 1942]" it should be construed to mean that the seller could pay such charges only as were lawfully imposed on him, under Maximum Price Regulation No. 259, by his supplier.

Under the stipulation § 1499.3 is the controlling regulation. That section uses the words "cost to him [seller]" without qualification, and defines "replacement cost" as including net cost after May 18, 1942. The interpretation placed upon the section by appellee, namely, that he was permitted to include the two disputed charges since they were part of the cost of the beer to him, and part of the net price paid by him after May 18, 1942, is reasonable. It seems the normal interpretation to be placed on such language; in fact it is the interpretation which the Administrator's Regional Office adopted and so notified appellee. Later, a contrary ruling was received from Washington.

■ If there is ambiguity or conflict between the stipulated regulation § 1499.3, and other regulations, § 1499.3 must control under the stipulation submitted to the trial court. Said regulation permits appellee to include return freight charges which he paid his supplier, and other elements of the net price which he would have to pay after May 18, 1942 "to replace such commodity". There is nothing in said section which forbids the payment of brokerage fees, if those are part of the net cost of the beer to appellee. It was not until

December 18, 1944, long after the last sale involved here, that the addition of § 5.3 to Regulation 259 specifically forbade the addition of brokerage fees to the seller's maximum price. We are unable to agree with the argument that the practice of paying such fees to secure beer was forbidden by implication prior to the adoption of the specific regulation on the subject.

■ It was contended by the Administrator, at the oral argument, that by the stipulation appellee has accepted the burden of proving that he did not violate the regulations and that because, as it is said, there is no evidence in the record showing that appellee actually paid the two disputed charges, or that his supplier lawfully imposed such charges, judgment must be entered for the Administrator in the larger sum.

The stipulation clearly provides in paragraph 11 that: "In the event the court should find that return freight is a proper and legitimate element of net unit cost for the purpose of computing maximum prices of the commodities * * * the actual amount of the overcharges are to be reduced by the sum of $4,223.30; that in the event the court should find that both return freight and commissions, brokerage charges, and finder's fees paid by said defendant [appellee] in connection with the purchase of the aforesaid commodities constitute proper elements of net unit cost, the said actual overcharges *on account thereof* shall be reduced by the total sum of $9,086.14 * * *."

■ Under the stipulation the facts are agreed upon and no further proof is necessary. The reasonable interpretation to be placed upon the provision of the stipulation that, in the event the court found the return freight charge to be legal that the judgment be reduced $4,223.30, is that the amount of such freight charges was $4,223.30. It is not reasonable to assume that the Administrator would agree to the reduction of his judgment in said amount, in any event, unless he conceded the amount to have been paid. The same may be said relative to the agreed reduction of $9,086.14 in the event of a ruling adverse to the Administrator on other legal questions.

The facts have been agreed upon. The burden of proof has not been shifted but has been lifted. Perhaps we can make our meaning more clear by the statement that had proof been adduced, independent of the stipulation, that not one of the charges had been paid, the Administrator, having had the legal questions decided adversely to his contentions, would be compelled to accept the stipulated reductions in the judgment.

Judgment affirmed.